**IN THE UNITED STATES DISTRICT COURT
EASTER DISTRICT OF ARKANSAS
NORTHERN DIVISION**

**CLEO WATKINS,** *et al.*                                                                    **PLAINTIFFS**

**v.**                                        **Case No. 3:17-cv-00272-KGB**

**LAWRENCE COUNTY, ARKANSAS,** *et al.*                                    **DEFENDANTS**

## OPINION AND ORDER

Before the Court is a motion for partial summary judgment filed by plaintiffs Cleo Watkins, Pyles Family Farms, LLC, Victor Hutcherson, Alevlla Hutcherson, Helen Knight, Michael Watkins, Betty Watkins, and George Carney (Dkt. No. 48). Defendants Lawrence County, Arkansas; John Thomison, in his official capacity as County Judge of Lawrence County; and William Powell, Donald Richey, Lloyd Clark, Heath Davis, Ernest Briner, Ronald Ingram, Tracy Moore, Kenney Jones, and Alex Latham, in their official capacities as members of the Lawrence County Quorum Court filed a response in opposition (Dkt. No. 59), and plaintiffs filed a reply (Dkt. No. 66). Additionally, defendants filed a separate motion for summary judgment (Dkt. No. 53). Plaintiffs filed a response (Dkt. No. 63), and defendants filed a reply (Dkt. No. 69). For the following reasons, the Court denies plaintiffs' motion for partial summary judgment and grants, in part, and denies, in part, defendants' motion for summary judgment (Dkt. Nos. 48, 53).

### I.     Factual Background

This matter concerns a bridge in Lawrence County, Arkansas, over the West Cache River Slough ("the Slough") (Dkt. No. 17, at 2). Plaintiffs, Craighead County farmers with agricultural fields in the East Cache River Basin, allege that defendants' actions have turned the bridge into a *de facto* dam causing substantial sediment buildup, choking off most of the Slough from the Cache

River proper, and causing substantial flooding of plaintiffs' lands and destruction of their crops (*Id.*).

Defendants assert that the Arkansas Department of Transportation ("ADT"), District 10, conducted a bridge inspection of the old wooden bridge ("the wooden bridge") on Lawrence County Road 717 ("Road 717") on July 28, 1997, and noted numerous structural deficiencies in the wooden bridge (Dkt. Nos. 55, ¶ 1; 55-2). Defendants maintain that, as part of the inspection process, the ADT prepared a cross-section drawing of the wooden bridge as it existed, and they ran soundings from the top of the wooden bridge to the streambed bottom (Dkt. Nos. 55, ¶ 1; 55-2; 55-6, at 3). According to then-Lawrence County Civil Attorney Dick Jarboe, the wooden bridge was condemned by the State, and the only way the County could make Road 717 accessible was with a bridge featuring railroad car culverts (Dkt. No. 63-10, at 124). The current bridge ("the culvert bridge") was constructed by the Lawrence County Road Department in August 1997, the month following a report concerning the bridge (Dkt. Nos. 54, at 2; 55, ¶ 2). The original bridge construction had four railroad car culverts (*Id.*). Local farmers questioned the four-culvert bridge, and the United States Army Corps of Engineers ("the Corps") determined that a fifth culvert should be added (Dkt. Nos. 54, at 2-3; 55, ¶ 2). Defendants modified the culvert bridge in 2003 by adding this fifth culvert in accordance with the Corps' determination (Dkt. Nos. 50, ¶ 17; 55-2). Defendants assert that the Corps believed this fifth culvert would create adequate flow, but plaintiffs dispute that the Corps conducted any proper analysis to arrive at this determination (Dkt. Nos. 55, ¶ 2; 64, ¶ 2). The Corps conducted a compliance inspection on April 30, 2003, determined defendants were in compliance with Sections 301 and 404 of the Clean Water Act, and issued a permit under Section 404 of the Clean Water Act, Nationwide Permit No. 14, for the culvert bridge on May 13, 2003 (Dkt. Nos. 55, ¶ 3; 63-13). The permit was conditioned on maintenance for

debris removal as needed, to allow for the passage of normal or expected high flows (Dkt. Nos. 54, at 3; 55-3).

In 1991, Lawrence County Quorum Court adopted Ordinance 1991-3, which established a flood ordinance for Lawrence County pursuant to Arkansas Code Annotated § 14-268-101, *et. seq.* (Dkt. No. 55, ¶ 4). Ordinance 1991-3 established the rules and regulations for construction of buildings within a floodplain (*Id.*). The area involved in this suit is all in the floodplain of the Cache River Basin (*Id.*). Defendants state that the Cache River Basin is an area of special flood hazard according to the ordinance, meaning that it is land in the floodplain within a community subject to a one percent or greater chance of flooding in any given year, but plaintiffs dispute this characterization and maintain that "an area of special flood hazard" is a term of art defined by the Federal Emergency Management Agency ("FEMA") and reflected by FEMA's Flood Insurance Rate Maps (Dkt. Nos. 55, ¶ 4; 64, ¶ 4). Ordinance 1991-3 defined "structure" as "a walled and roofed building, including a gas or liquid storage tank, that is principally above ground, as well as a manufactured home." (Dkt. No. 55, ¶ 5). The term "substantial improvement" and the term "new construction" both referred to structures as the objects which were subject to the regulations (*Id.*). Ordinance 1991-3 remained in full force and effect from its passage on March 11, 1991, until it was replaced in November 2012 by Ordinance 9 of 2012 (Dkt. Nos. 50, ¶ 1; 55, ¶ 6).

Defendants claim that they were never presented with any scientific evidence that the culvert bridge may be restrictive of the flow of water until plaintiffs presented a hydrology report from Marc Johnson[1] during the course of discovery in this case (Dkt. No. 55, ¶ 8). Plaintiffs assert that separate plaintiff George Carney, who previously worked as a civil engineer for the Corps and

---

[1] The Court described this expert report in its May 19, 2020, Order that, in part, denied defendants' motion to exclude Mr. Johnson's expert testimony (Dkt. No. 107).

currently works for FEMA, submitted a detailed study to Lawrence County showing that the culvert bridge restricted the flow of water in 2009 and sent Lawrence County a letter to the same effect in 2002 (Dkt. Nos. 63-1, ¶¶ 16, 18-19, 26; 64, ¶ 8). Defendants acknowledge that Mr. Carney sent a letter in September 2009 expressing concern about the culvert bridge's configuration and that the Corps made a field inspection on September 5, 2009, in response to this letter (Dkt. No. 54, at 4). The Corps' representative indicated that it was noticeable during the survey that the pipes were mostly clogged and regular maintenance would be required to keep the pipes open, though the representative also noted that since the culvert bridge was over five years old it was past the Corps' statute of limitations to proceed with further enforcement action (Dkt. Nos. 54, at 4; 55-5).

Defendants state that Mr. Johnson's engineering report is based off a design model which appears as Figure 4 in his report and that based upon this diagram and the flow rates derived therefrom, Mr. Johnson projects that anytime the Cache River gage at Egypt, Arkansas ("the Egypt gage") shows flow rates of between 2,000 and 5,500 cubic feet per second ("cfs"), then plaintiffs' parcels are being flooded to some unstated degree (Dkt. Nos. 55, ¶¶ 9-10; 55-7). When the flow is over 5,500 cfs, Mr. Johnson projects that plaintiffs' property remains flooded, but the water at that level would be present regardless of the type of structure over the Slough (Dkt. No. 55, ¶ 10). Defendants claim that Mr. Johnson's opinions are made without having spoken with any plaintiff about flooding conditions on their properties relative to flow rates as determined by the Egypt gage on the Cache River (*Id.*, ¶ 11). Plaintiffs state that Mr. Johnson used FEMA's Base Level Engineering two-dimensional unsteady flow HEC-RAS hydraulic model in creating his report for the Cache River Basin ("HEC-RAS model") (Dkt. No. 64, ¶ 9). Plaintiffs assert that this model requires extensive computing power and is too large to be placed on a piece of paper, that Mr.

Johnson did not place Figure 4 into the HEC-RAS model, and that Figure 4 constitutes a separate opinion from Mr. Johnson that is unrelated to the HEC-RAS modelling or model results (*Id.*). Accordingly, plaintiffs maintain that Figure 4 had no impact on the HEC-RAS modelling results (*Id.*, ¶ 10). Plaintiffs claim that Mr. Johnson found that the culvert bridge caused flooding on plaintiffs' properties, that the flooding is most likely to occur when the Egypt gage reflects flows between 2,000 and 5,500 cfs, and that Mr. Johnson's report contains results for plaintiff's parcels showing increased flood duration and height (*Id.*). Plaintiffs also state that Mr. Johnson has talked with one or more plaintiff about flooding conditions on their properties (*Id.*, ¶ 11).

Plaintiffs bring this action pursuant to Arkansas Code Annotated § 14-268-105; Arkansas Code Annotated § 18-15-703; the Takings Clause of the Fifth Amendment to the United States Constitution; the Takings Cause of Article Two, Section 22 of the Arkansas Constitution; 42 U.S.C. § 1983; the Arkansas Civil Rights Act ("ACRA"), Arkansas Code Annotated § 16-123-105(a); and *Ex parte Young*, 209 U.S. 123 (1908) (Dkt. Nos. 17, ¶¶ 55-190; 54, at 4). Plaintiffs ask this Court to award them judgment against defendants in the form of injunctive relief; actual damages; consequential damages; double damages pursuant to Arkansas Code Annotated § 18-15-702 and any other applicable statutory penalty; all other fees, costs, and expenses to which they may be lawfully entitled, including pre- and post-judgment interest; and other just and proper relief to which they may be entitled (Dkt. No. 17, at 26).

## II.    Legal Standard

Summary judgment is proper if there is no genuine issue of material fact for trial. *UnitedHealth Group Inc. v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56). Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and

that the defendant is entitled to entry of judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In ruling on a motion for summary judgment '[t]he district court must base the determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'" *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923 (8th Cir. 2004) (internal citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Johnson Regional Medical Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008), *cert. denied*, 522 U.S. 1048 (1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### III.    Plaintiffs' Partial Motion For Summary Judgment

Plaintiffs move for partial summary judgment and a permanent injunction under Arkansas Code Annotated § 18-15-703, which is count two of their operative complaint (Dkt. Nos. 17, ¶¶

87-98; 48, ¶¶ 3-4, 6; 59, at 1; 66, at 1).[2]  Under that statute, "[a]ll dams, stoppages, or obstructions not made according to law shall be deemed to be public nuisances and shall be dealt with accordingly."  Ark. Code Ann. § 18-15-703.  Plaintiffs argue that the culvert bridge is a *de facto* dam, stoppage, or obstruction and that its construction violated three separate laws:  (1) Ordinance 1991-3; (2) Section 404 of the Clean Water Act, 33 U.S.C. § 1344; and (3) federal regulations promulgated under the National Flood Insurance Act of 1968, 42 U.S.C. § 4001, *et seq.*, 44 C.F.R. § 60.1(b) (Dkt. No. 49, at 7-8).  Defendants respond that the culvert bridge is not subject to § 18-15-703 because it is not a *de facto* dam, stoppage, or obstruction; that the culvert bridge was not illegally built; and that plaintiffs cannot demonstrate their entitlement to injunctive relief (Dkt. No. 59, at 2-4).  Plaintiffs reply that their photographs and expert Marc Johnson's opinion "show[] that the [culvert] bridge is a self-evident dam, stoppage, or obstruction," that § 18-15-703 applies to the culvert bridge, that the bridge was illegally made, and that injunctive relief is warranted (Dkt. No. 66, at 2-10).

### A.    Application Of § 18-15-703

Under Arkansas law, the question of the correct application and interpretation of an Arkansas statute is a question of law, which generally is reserved for the Arkansas Supreme Court's *de novo* review.  *Hammerhead Contracting & Development, LLC v. Ladd*, 489 S.W.3d 654, 658-59 (Ark. 2016) (citing *Evans v. Hamby,* 378 S.W.3d 723 (Ark. 2011)).  "The purpose of the rules of statutory construction is to give effect to the intent of the legislature."  *Hammerhead*, 2016 at 659 (citing *State v. Colvin,* 427 S.W.3d 635 (Ark. 2013)).  The first rule of statutory construction is to construe a statute just as it reads, giving the words their ordinary and usually

---

[2]  Plaintiffs initially also moved for partial summary judgment on their cause of action for public nuisance pleaded pursuant to Arkansas Code Annotated § 14-268-105 (Dkt. No. 49, at 3-7).  The parties jointly stipulated to the dismissal of that claim on August 29, 2019 (Dkt. No. 62).

accepted meaning in common language.  *See Smith v. Simes,* 430 S.W.3d 690 (Ark. 2013).  The

Arkansas Supreme Court construes the statute "so that no word is left void, superfluous, or

insignificant; and meaning and effect are given to every word in the statute if possible." *Hartford*

*Fore Ins. Co. v. Sauer*, 186 S.W.3d 229, 233 (Ark. 2004) (quoting *Turnbough v. Mammoth Spring*

*Sch. Dist. No. 2,* 78 S.W.3d 89, 92 (Ark. 2002) (citing *Stephens v. Ark. Sch. for the Blind*, 20

S.W.3d 397 (Ark. 2000))).  "When the language of a statute is plain and unambiguous and conveys

a clear and definite meaning, there is no need to resort to rules of statutory construction." *Id.*

"However, [the Arkansas Supreme Court] will not give statutes a literal interpretation if it leads to

absurd consequences that are contrary to legislative intent." *Id.* (quoting *Turnbough*, 78 S.W.3d

at 92 (citing *Burford Distrib., Inc. v. Starr,* 20 S.W.3d 363 (Ark. 2000))).  Additionally, in

construing any statute, the Arkansas Supreme Court "place[s] it beside other statutes relevant to

the subject matter in question and ascribe meaning and effect to be derived from the whole."

*Hammerhead*, 489 S.W.3d at at 659 (citing *Colvin,* 427 S.W.3d 635).  "Statutes relating to the

same subject must be construed together and in harmony, if possible." *Id.*

Plaintiffs argue that the culvert bridge should be considered a *de facto* dam, stoppage, or

obstruction under § 18-15-703.  To the Court's knowledge, § 18-15-703 has never been cited or

interpreted in any prior case, and Arkansas Code Annotated § 18-15-701, *et seq.*, provides no

definitions of these relevant terms and no legislative history to guide the Court's inquiry.[3]

---

[3]  The Court acknowledges that Arkansas case law defines "public nuisance":

"Nuisance is defined as conduct by one landowner which unreasonably interferes
with the use and enjoyment of the lands of another and includes conduct on property
which disturbs the peaceful, quiet, and undisturbed use and enjoyment of nearby
property." *Ark. Rel. Guidance Fdn. v. R.J. Needler,* 252 Ark. 194, 477 S.W.2d 821
(1972).  "Equity will enjoin the conduct which culminates in a private or public
nuisance where the resulting injury to the nearby property and residents, or to the
public, is certain, substantial, and beyond speculation and conjecture." *Id.*  The

However, in *Nahay v. Arkansas Irrigation Co.*, 190 S.W.2d 965 (Ark. 1945), the Arkansas Supreme Court examined other statutes in this section when confronted with a question regarding their applicability. Specifically, in *Nahay*, Arkansas Irrigation sought to condemn certain property because it would be overflowed by a dam it had constructed across Bayou La Grue. *Id.* at 965. Separate suits were consolidated, and cross complaints were filed. *Id.* Parties directed the Court to "§§ 4944-4970 of Pope's Digest," which corresponds to Arkansas Code Annotated § 18-15-704, and argued "that the measure deals exclusively with the construction of dams across non-navigable watercourses." *Id.* at 966. Appellants maintained that, under the Act, "proceedings must be filed in Circuit Court, stating that the petitioner is the owner in fee simple of land on which the dam is to be constructed. Another section governs where the petitioner owns land on one side of the watercourse and a part of the bed 'at the point where he proposes to erect a dam.'" *Id.* Appellants further argued that, in either case, the proceeding contemplated by the Act was similar and that it was not followed by Arkansas Irrigation. *Id.* Appellants insisted that the Act "does not grant the right to build mills or other agencies for utilization of the water," but instead, its "sole purpose . . . is to prescribe an exclusive method by which dams may be constructed across non-navigable waters, and failure to follow the prescribed procedure is fatal." *Id.* Appellants argued that the "statute covers the whole field of the construction of dams across non-navigable streams, except dams for certain specific purposes, such as hydroelectric plants." *Id.*

---

distinction between private and public nuisance is simply the extent of the injury, *i.e.* the number of persons suffering the effects of the nuisance. *Id.*

*Milligan v. Gen. Oil Co.*, 738 S.W.2d 404, 404 (Ark. 1987).

The Arkansas Supreme Court concluded that the Act "is somewhat broader," determining that "[i]ts language clearly shows that the law-making body thought of dams as a means for providing mill power." *Id.* Citing specific examples of references to dams, mills, and other machinery which is to be connected to dams, the Arkansas Supreme Court concluded that "[w]hen the Act in its entirety is read, and when it is considered in the light of conditions prevailing in 1838, as emphasized by repeated references to 'the mill,' 'the machinery,' 'his mill,' and words of like import, there is the compelling thought that mill dams were the primary subject of legislative concern." *Id.*

These references to dams, mills, and other machinery connected to dams remain in the current version of the statute. *See, e.g.,* Ark. Code Ann. §§ 18-15-705(a); 18-15-709(b)(3); 18-15-710; 18-15-711; 18-15-712(b)(1), (c); 18-15-714. When describing the dams to be authorized by these statutory provisions, the statute states: "By proceeding as provided in this subchapter, any person may erect a dam across any watercourse not being a navigable stream . . . ." Ark. Code Ann. § 18-15-704.[4]

The parties do not address in their briefing whether a structure must be created with the intent to dam, stop, or obstruct the flow of water to be considered a dam, stoppage, or obstruction subject to § 18-15-703; whether a bridge can ever be considered a *de facto* dam, stoppage, or obstruction subject to § 18-15-703; whether, even if it can, the *de facto* dam, stoppage, or obstruction must cross a non-navigable stream to be subject to § 18-15-703; whether, if it can, how

---

[4] Under Arkansas law, determining the navigability of a stream is essentially a matter of deciding if it is public or private property. *State v. McIlroy,* 595 S.W.2d 659 (Ark. 1980), *cert. denied,* 449 U.S. 843 (1980); *see also Ark. River Rights Comm. v. Echubby Lake Hunting Club*, 126 S.W.3d 738 (Ark. Ct. App. 2003). If a body of water is navigable, it is considered to be held by the State in trust for the public. *See Hayes v. State,* 496 S.W.2d 372 (Ark. 1973). Navigability is a question of fact under Arkansas law. *Goforth v. Wilson,* 184 S.W.2d 814 (Ark. 1945); *Echubby*, 126 S.W.3d at 285.

much flow must be dammed, stopped, or obstructed to make a bridge a *de facto* dam, stoppage, or obstruction; and most importantly why the entire subsection, titled "Dams, Mills, Etc.," should not be limited in applicability to dams, mills, and like structures especially in the light of the Arkansas rules regarding statutory construction and the *Nahay* court's determination.  At this point, the Court reserves determining whether these provisions apply to the fact presented.  The Court will provide the parties an additional opportunity to address the Court with respect to these legal issues before the Court makes its determination, should they choose to do so.

### B.    Disputed Factual Issues That Impact Application Of § 18-15-703

Even if § 18-15-703 applies to the facts of this case, on the record evidence before it, the Court determines that there is a genuine issue of material fact in dispute as to whether the culvert bridge has a *de facto* damming, stopping, or obstructing effect on the Slough.  Plaintiffs and defendants both move for summary judgment on this issue, presenting conflicting record evidence for the Court's consideration.  Further, the Court examined this factual dispute to an extent in its May 19, 2020, Order denying both sides' motions to exclude expert testimony (Dkt. No. 107).  Plaintiffs' expert Marc Johnson argues that the culvert bridge has a damming effect on the West Cache River Ditch (Dkt. No. 51-1).  Defendants' expert Shawkat Ali, Ph.D., argues that the river's flow through the culvert bridge is uniform without any damming effect or increased flood elevation upstream of the culverts (Dkt. No. 46-1).  The Court will not exclude either experts' proposed opinions and testimony under *Daubert*, and a jury's determination regarding these competing opinions will likely be outcome-determinative.  If the culvert bridge has no *de facto* damming, stopping, or obstructing effect on the Slough, there can be no argument that Arkansas Code Annotated § 18-15-703 applies.  If the culvert bridge has a *de facto* damming, stopping, or obstructing effect on the Slough, then the Court will decide as a matter of law whether Arkansas

Code Annotated § 18-15-703 applies and may resolve this issue in advance, after the parties are provided an additional opportunity to address the Court.

Because the Court finds a genuine issue of material fact in dispute as to whether the bridge has a *de facto* damming, stopping, or obstructing effect on the Slough, and because that factual dispute impacts whether the culvert bridge even could be considered a dam, stoppage, or obstruction under § 18-15-703, the Court denies plaintiffs' motion for partial summary judgment.

Given these determinations, the Court will not consider at this time whether the bridge's construction and maintenance violated the three laws cited by plaintiffs or whether plaintiffs have satisfied the standard warranting a permanent injunction, which also are necessary for plaintiffs to prevail on this claim.

## IV.    Defendants' Motion For Summary Judgment

Defendants move for summary judgment, arguing that the culvert bridge was legally placed and remains a permitted bridge under the authority of the Corps (Dkt. No. 53, ¶ 1). Defendants maintain that the culvert bridge is not a nuisance and that, given its legal placement, plaintiffs are not entitled to declaratory judgment or any relief in the way of injunctions or damages related thereto (*Id.*, ¶¶ 1-2). Finally, defendants argue that the culvert bridge has not caused a taking of plaintiffs' properties for public use without just compensation, and, as a result, plaintiffs' claims for inverse condemnation and violation of 42 U.S.C. § 1983 or the ACRA are without merit and should be dismissed (*Id.*, ¶ 3). In response, plaintiffs argue that defendants have failed to put forth proof showing that they are entitled to judgment as a matter of law and that numerous fact issues remain in dispute, particularly the underlying causation question (Dkt. No. 63, at 1). In reply, defendants maintain that they are entitled to summary judgment on plaintiffs' declaratory judgment, inverse condemnation, and § 1983 claims (Dkt. No. 69, at 1-8).

The Court observes that plaintiffs' operative amended complaint is not a model of clarity (Dkt. No. 17).  Plaintiffs assert in count two a claim for declaratory judgment under § 18-15-703 (Dkt. No. 17, ¶¶ 87-98).  Plaintiffs assert in count three a claim for inverse condemnation, specifically citing with respect to the claim the Arkansas and United States Constitutions and specifically citing with respect to the relief sought the Arkansas and United States Constitutions, along with Arkansas Code Annotated § 18-15-202 and § 18-15-410 which are state law inverse condemnation provisions (*Id.*, ¶¶ 99-113).  Plaintiffs in count four, in the alternative to all other claims, assert claims under 42 U.S.C. § 1983 that, as best the Court can tell, rely on defendants' alleged "deliberate decision-making and indifference" to plaintiffs' complaints resulting in a custom or policy of refusing to maintain the bridge (*Id.*, ¶ 127); defendants' conduct as allegedly interfering with plaintiffs' right to access and use their real and personal property (*Id.*, ¶ 130); defendants' conduct as allegedly interfering with plaintiffs' right to earn a living (*Id.*, ¶ 131); defendants' deprivation of plaintiffs' private property, due process, and liberty interests guaranteed by the Fourteenth Amendment to the United States Constitution (*Id.*, ¶ 133); and preference for defendants' own Lawrence County constituents over plaintiffs as depriving plaintiffs of equal protection of the law as guaranteed by the Fourteenth Amendment to the United States Constitution (*Id.*, ¶¶ 134, 138).  In count five, plaintiffs allege violations of the ACRA, Arkansas Code Annotated § 16-12-105(a), basing these claims on Arkansas statutes and provisions of the Arkansas Constitution, as best the Court can tell (*Id.*, ¶¶ 144-59).  Plaintiffs also allege in count six what they describe as an "Ex Parte Young violation" (*Id.*, ¶¶ 160-90).  The Court takes each remaining count asserted in plaintiff's complaint in turn.

### A.    Public Nuisance Under § 18-15-703

Defendants argue that the culvert bridge is a "free-flowing bridge which has no features in common with a dam, stoppage or obstruction" and is not a public nuisance as a matter of law since it stands today permitted properly by the Corps (Dkt. No. 54, at 12).  Defendants maintain that they are entitled to summary judgment on this claim since the bridge is not a public nuisance and § 18-15-703 has no application (*Id.*).  Plaintiffs reiterate their argument that the bridge should be considered an illegal *de facto* dam, stoppage, or obstruction in violation of § 18-15-703 (Dkt. No. 63, at 2-8).  Just as the Court expressed uncertainty regarding whether § 18-15-703 applies to the culvert bridge in evaluating plaintiffs' motion for partial summary judgment, the Court is unwilling to decide at this time on the briefing before it that § 18-15-703 *does not* apply as a matter of law to the culvert bridge.  The disputed questions discussed above—whether § 18-15-703 applies to the culvert bridge; whether the culvert bridge has created a *de facto* damming, stopping, or obstructing effect; whether the culvert bridge was built or maintained illegally; and whether the culvert bridge constitutes a public nuisance—remain unresolved by the record evidence.  For these reasons, the Court denies defendants' motion for summary judgment on plaintiffs' public nuisance claim under § 18-15-703.

### B.    Inverse Condemnation

In their complaint, plaintiffs allege five wrongdoings related to their inverse condemnation claim:  (1) temporary but regularly occurring physical invasions caused by Lawrence County action or authority; (2) lost or destroyed crops resulting from such physical invasions; (3) diminution in value of plaintiffs' properties caused by Lawrence County action or authority; (4) damages resulting from the deprivation or use of their property; and (5) damages to plaintiffs' properties such as destroyed trees, lost nutrients, physical loss of land, and damage to

improvements (Dkt. No. 17, ¶ 113).  Plaintiffs assert that such actions amount to impermissible takings violating Article 2, § 22 of the Arkansas Constitution and the Fifth Amendment of the United States Constitution (*Id.*, ¶¶ 101-02, 111-13).[5]  Federal takings claims are cognizable under 42 U.S.C. § 1983.  *See Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency,* 440 U.S. 391, 398–400 (1979).  In their request for relief on this claim, along with citing the Arkansas and United States Constitutions, plaintiffs cite Arkansas Code Annotated § 18-15-202 and § 18-15-410 which are state law inverse condemnation provisions (Dkt. No. 17, ¶¶ 99-113).

Defendants characterize plaintiffs' inverse condemnation claims as a "guise" for a negligence action against defendants, which defendants state would be barred under Arkansas Code Annotated § 21-9-301 (Dkt. No. 54, at 13).  Defendants also argue that, under controlling Supreme Court precedent, their position merits summary judgment on plaintiffs' inverse condemnation claims (*Id.*, at 14-23).

### 1.    Takings Claim Legal Standard

The Takings Clause of the Fifth Amendment of the United States Constitution provides that "nor shall private property be taken for public use, without just compensation."  U.S. Const. amend. V.  "If a local government takes private property without paying for it, that government has violated the Fifth Amendment—just as the Takings Clause says."  *Knick v. Township of Scott*, 139 S. Ct. 2162, 2170 (2019).  Similarly, Article 2, § 22 of the Arkansas Constitution states that "private property shall not be taken, appropriated, or damaged for public use, without just compensation therefor."  Ark. Const. art. II, § 22.

---

[5]  No party argues to this Court that the standard for this type of claim differs under the Arkansas and United States Constitutions.  In fact, prior cases from the Arkansas Supreme Court counsel that the same standard applies to these claims.  *See J.W. Black Lumber Co. v. Ark. Dep't of Pollution Control & Ecology*, 717 S.W.2d 807, 810 (Ark. 1986); *see also Ark. Game & Fish Comm'n v. Heslep*, 577 S.W.3d 1 (Ark. 2019).

While the Arkansas Supreme Court has not provided a "definitive statement" of what constitutes a taking, it has provided the following definition:

> A taking is described as damage that will substantially oust the owner and deprive him of all beneficial enjoyment thereof; will substantially abridge the owner's rights to such an extent as to deprive him of his right; will be an interference with or disturbance of property rights resulting in injuries which are not merely consequential or incidental; a taking is determined by the character of the invasion and not by the amount of damage resulting from it, as long as the damage is substantial.

*Thompson v. City of Siloam Springs*, 969 S.W.2d 639, 642 (Ark. 1998) (quoting *City of Fayetteville v. Stanberry*, 807 S.W.2d 26, 28 (Ark. 1991)).  "Arkansas has, by statute, authorized a cause of action allowing property owners to obtain compensation for any property so taken."  *Roy v. City of Little Rock*, 902 F. Supp. 871, 877 (E.D. Ark. 1995).

"Inverse condemnation is 'a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant.'"  *See Knick*, 139 S. Ct. at 2168 (quoting *United States v. Clarke*, 445 U.S. 253, 257 (1980)).  "Inverse condemnation stands in contrast to direct condemnation, in which the government initiates proceedings to acquire title under its eminent domain authority."  *Id.*

The Arkansas Supreme Court has "interpreted this [state Takings Clause] to require compensation for a taking when a municipality acts in a manner which substantially diminishes the value of a landowner's land, and its actions are shown to be intentional."  *Thompson*, 969 S.W.2d at 641 (citing *Robinson v. City of Ashdown*, 783 S.W.2d 53 (Ark. 1990)).  Notably, the Arkansas Supreme Court has also concluded that "when one knows that an invasion of another's interest in the use and enjoyment of land is substantially certain to result from one's conduct, the invasion is intentional," including when such "invasion continue[s] long after [defendant] was put on notice of it."  *Robinson*, 783 S.W.2d at 56.  The Arkansas Supreme Court has also

acknowledged that "instances of negligence, with respect to which the [County] has immunity from suit, may, if sustained a long time, amount to inverse condemnation." *Id.* at 54. Indeed, under Arkansas law "a continuing trespass or nuisance could ripen into inverse condemnation." *Nat'l By-Prod., Inc. v. City of Little Rock By & Through Little Rock Reg'l Airport Comm'n*, 916 S.W.2d 745, 748 (Ark. 1996) (citing *Robinson*, 783 S.W.2d at 55). For these reasons, although defendants are correct that counties generally are "immune from liability and from suit for damages except to the extent that they may be covered by liability insurance," Ark. Code Ann. § 21-9-301(a), that argument does not resolve the parties' disputes here.

Many Arkansas cases have held that government-induced flooding of private lands for public use that causes more permanent damage constitutes a taking, *see Keith v. Drainage Dist. No. 7*, 36 S.W.2d 59 (Ark. 1931); *Hogge v. Drainage Dist. No. 7*, 26 S.W.2d 887 (Ark. 1930); *Sharp v. Drainage Dist. No. 7*, 261 S.W. 923 (Ark. 1924), and the Supreme Court has recently recognized that "government-induced flooding temporary in duration gains no automatic exemption from Takings Clause inspection," *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 38 (2012); *see also id.* at 27 ("We . . . conclude that recurrent floodings, even if of finite duration, are not categorically exempt from Taking Clause liability."). These temporary and recurring floods, however, "are subject to a more complex balancing process to determine whether they are a taking." *Id.* at 36 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982)).

### 2.    Standing

As an initial matter, the Court addresses plaintiffs' standing to bring an inverse condemnation claim pursuant to Article 2, § 22 of the Arkansas Constitution and the Fifth Amendment of the United States Constitution. As the Court understands defendants' argument,

defendants maintain that, because plaintiffs' real properties are outside the boundary of Lawrence County, Lawrence County could not take plaintiffs' properties in a typical eminent domain case, in which the government seeks the property, offers to pay fair market value for the property, and intends to use the property for some public purpose. Defendants argue that "Lawrence County lacks constitutional authority to do so and, as such, and as a corollary, these Plaintiffs should not be able to claim inverse condemnation against Lawrence County." (Dkt. No. 54, at 23). As plaintiffs correctly point out, defendants cite no legal authority for this argument (Dkt. No. 63, at 14).

The doctrine of standing ensures that courts hear only "those disputes which are appropriately resolved through the judicial process," and the doctrine implicates this Court's subject matter jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted). "[T]he irreducible constitutional minimum of standing contains three elements." *Id.* First, plaintiffs must have suffered an "injury in fact," which is defined as an invasion of a legally protected interest which is concrete and particularized and actual or imminent. *Id.* Second, there must be a causal connection between the injury and the conduct about which plaintiffs complain. *Id.* Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* Having examined the record evidence and all filings before the Court, the Court concludes that plaintiffs have standing at this stage of the litigation to bring an inverse condemnation claim pursuant to 42 U.S.C. § 1983 as a violation of the Fifth Amendment of the United States Constitution. *See Knick*, 139 S. Ct. at 2170.

In making this determination, the Court concedes that, prior to the *Knick* decision, plaintiffs generally were required to seek compensation through the state from the governmental entity charged with the taking, if adequate state procedures were available, before pursuing a takings

claim in federal court.  *See, e.g., McKenzie v. City of White Hall*, 112 F.3d 313 (8th Cir. 1997)

(addressing standing to bring an inverse condemnation claim under § 1983 and overruled in part

by *Knick*).  Under Arkansas law, the state procedure for seeking compensation from a municipality

for inverse condemnation generally is set forth in Arkansas Code Annotated § 18-15-410(a):

> If a municipality shall enter upon property which it has the right to acquire by
> condemnation proceedings without commencing condemnation proceedings, the
> owner of the property shall have the right to commence condemnation proceedings
> against the municipality at any time before an action for the recovery of the property
> or compensation therefore would be barred by the statute of limitations.

From their amended complaint, it appears that plaintiffs may be pursuing an Arkansas state law

inverse condemnation claim pursuant to § 18-15-410, citing also the eminent domain provision

applicable to counties' water and sewer facilities in Arkansas Code Annotated § 18-15-202.

Even if plaintiffs allege state law inverse condemnation claims, plaintiffs clearly assert

inverse condemnation claims under the Arkansas Constitution and, through § 1983, the Fifth

Amendment of the United States Constitution.  This Court determines that plaintiffs have standing

to maintain their federal inverse condemnation claim based on their allegations, separate and apart

from any rights under Arkansas state law.  *Knick*, 139 S. Ct. at 2170.

### 3.    Analysis

With respect to the merits of plaintiffs' inverse condemnation claims, both sides

acknowledge the threshold requirement of a public purpose or public use component of a takings

claim (Dkt. Nos. 54, at 23; 63, at 13-14).  *See* U.S. Const. amend. V (". . . nor shall private property

be taken *for public use*, without just compensation." (emphasis added)); Ark. Const. art. II, § 22

("[P]rivate property shall not be taken, appropriated, or damaged *for public use*, without just

compensation therefor."   (emphasis added)).   Both parties also acknowledge correctly that

*Arkansas Game and Fish* provides controlling precedent for plaintiffs' inverse condemnation

claims (Dkt. Nos. 54, at 14; 63, at 8; 69, at 3).  In considering whether temporary interference with property rights constitutes a taking, if there is a public purpose or public use, courts then are to consider various factors, including:  (1) the "time" or duration of the interference; (2) "the degree to which the invasion is intended or is the foreseeable result of authorized government action"; (3) "the character of the land at issue"; (4) "the owner's 'reasonable investment-back expectations' regarding the land's use"; and (5) the "[s]everity of the interference."  *Id.* at 38-39 (citations omitted).

Defendants also maintain that "control of the instrument of harm" is a factor (Dkt. No. 54, at 16).  In citing this factor, defendants rely upon the facts of the *Arkansas Game and Fish* case, highlighting that the government entity owned and exclusively controlled the water at issue in that case (*Id.*).  Here, defendants claim that the water at issue is rainwater, not subject to defendants' control.  In considering this factor, the Court finds instructive the holding and analysis in *Nicholson v. United States*, 77 Fed. Cl. 605, 611 (Fed. Cl. 2007).  In *Nicholson*, following Hurricane Katrina, New Orleans property owners sued the United States alleging that the flood control system was improperly designed and ineffectively maintained, resulting in damage to plaintiffs' properties. Based on the facts presented in that case, the Court of Claims found no taking.  *Id.* at 614.  The Court finds that analysis instructive, given the parties' arguments here.

For the following reasons, on the record evidence before it, the Court finds that genuine issues of material fact are in dispute that preclude granting summary judgment in defendants' favor on plaintiffs' inverse condemnation claims.

### a.    Public Purpose

Defendants argue that Lawrence County receives no public benefit by sending floodwaters onto plaintiffs' properties, thus depriving this alleged taking of its required public purpose under

both federal and state law (Dkt. Nos. 54, at 23; 69, at 5).  Plaintiffs respond that Lawrence County built and maintains the culvert bridge with public funds for use by its citizens and receives the benefit of its residents' use of the culvert bridge to cross the Slough on Road 717 (Dkt. No. 63, at 13-14).  Plaintiffs also argue that defendants use the bridge as a dam to force floodwaters away from Lawrence County into Craighead County, making diversion of floodwaters a second public use of the culvert bridge (*Id.*, at 14).

Constructing, maintaining, and repairing a public bridge represents an example of government action for public use.  *See W. River Bridge Co. v. Dix*, 47 U.S. 507 (1848); *Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. 420 (1837); *Campbell v. Ark. State Highway Comm'n*, 38 S.W.2d 753 (Ark. 1931); *Fulton Ferry & Bridge Co. v. Blackwood*, 293 S.W. 2, 9 (Ark. 1927).  Furthermore, the Supreme Court has held that inadvertent flooding of private property stemming from some other activity can constitute government action for public use and, consequently, a taking.  *See Pumpelly v. Green Bay Co.*, 80 U.S. 166, 181 (1871) ("[W]here real estate is actually invaded by superinduced additions of water . . . so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution."); *see also United States v. Kan. City Life Ins., Co.*, 339 U.S. 799 (1950); *United States v. Dickinson*, 331 U.S. 745 (1947); *United States v. Cress*, 243 U.S. 316 (1917); *United States v. Welch*, 217 U.S. 333 (1910);  *United States v. Lynah*, 188 U.S. 445 (1903).  Thus, the Court cannot conclude that, as a matter of law, there is no public purpose or public use as required to substantiate a takings claim.

### b.    Time

Defendants argue that one element of the "time" factor is the timing of rainfall over plaintiffs' properties, and defendants maintain that historic rainfall averages during preparation, planting, and growing seasons for rice and soybeans constitute an independent intervening cause

for the flooding plaintiffs have experienced (Dkt. No. 54, at 16-18).  Defendants also argue that the record evidence demonstrates a lack of any long-term effects from the flooding and provides only speculation regarding the duration of any flooding suffered by plaintiffs (*Id.*, at 21-22). Plaintiffs maintain that the length of time that flooding has occurred is the appropriate metric in considering the "time" factor (Dkt. No. 63, at 9).  Plaintiffs assert that they and their predecessors have largely farmed the same tracts of land since the early- to mid-twentieth century but began experiencing increased flooding only after Lawrence County installed the culvert bridge (*Id.*). Plaintiffs claim that where the plaintiffs in *Arkansas Game and Fish* complained to the Corps for only six years, plaintiffs have complained to defendants here for approximately 20 years (*Id.*).  As explored further in the severity section below, plaintiffs also argue that Mr. Johnson's report evinces the duration of flooding affecting plaintiffs' properties (Dkt. No. 63-4, at 12-29).

There is record evidence from which a factfinder could conclude that plaintiffs complained to defendants of flooding allegedly stemming from the culvert bridge before initiating this lawsuit on October 10, 2017 (Dkt. No. 1).  The record evidence shows several formal complaints regarding the culvert bridge since 2001:  (1) a letter to Judge Latham sent by Charles Frierson, III, at the request of the Commissioners of Cache River Drainage District of Craighead, Jackson, and Lawrence Counties dated March 28, 2001; (2) a letter to Judge Latham sent by Noyl Houston, a lawyer representing a group of farmers and farm owners, including separate plaintiff Cleo Watkins, dated April 17, 2001, to which Mr. Jarboe replied on April 27, 2001; (3) a response letter from Mr. Houston to Mr. Jarboe advocating the installation of a proper bridge and dated April 30, 2001, to which Mr. Jarboe replied on May 3, 2001; (4) a letter to Judge Latham from separate plaintiff Mr. Carney claiming that the bridge blocks the flow of floodwater dated July 24, 2002; (5) Mr. Carney's so-called "Sedimentation Study" regarding the alleged Cache River sandbar dated

September 10, 2009; (6) a letter to Judge Latham from Mr. Carney advocating the removal and replacement of the culvert bridge dated September 16, 2009; and (7) a letter to Judge Thomison sent by Micah Goodwin, former counsel of record for defendants in this matter, regarding the impending filing of this lawsuit dated April 12, 2017 (Dkt. No. 63-10, at 94-98, 122-33).

The Court notes that these first four complaints addressed the four-culvert bridge the County initially built in August 1997 to replace the wooden bridge and maintained until its replacement by the five-culvert bridge in 2003. The record evidence shows no complaints regarding the five-culvert bridge between Mr. Carney's July 24, 2002, letter and Mr. Carney's September 16, 2009, letter. Further, record evidence indicates only one complaint from 2010 to the date suit was filed in 2017.

There are genuine issues of material fact in dispute regarding whether plaintiffs suffered increased recurrent flooding due to the modified culvert bridge for years prior to filing suit and whether defendants were on notice of that fact for years before plaintiffs filed suit. These factual disputes preclude the Court from granting defendants' motion for summary judgment.

### c.     Foreseeability

Plaintiffs argue that the Corps made clear the objectively foreseeable risk that the culvert bridge would dam up floodwaters back in 2001 (Dkt. No. 63, at 10). However, plaintiffs rely on a letter to Judge Latham from the Corps regarding the four-culvert bridge that stood from 1997 until 2003 dated June 8, 2001 (Dkt. No. 63-11). In that letter, the Corps stated that it had run hydraulic analysis regarding the four-culvert bridge and that analysis indicated potential adverse flooding upstream and impeded and restricted flow (*Id.*, at 1). The Corps informed Mr. Latham that the four-culvert bridge was in violation of Sections 301 and 404 of the Clean Water Act, that a permit had not been issued, and that he was required under law to remove the fills associated

with the culverted road crossing by August 31, 2001 (*Id.*). The Corps also informed Mr. Latham that he could "construct a bridged crossing provided it meets the requirements of the enclosed Nationwide Permit No. 14" and the relevant Nationwide Permit Conditions (*Id.*).

There is record evidence that, after receiving this letter, defendants added the fifth culvert to the culvert bridge (Dkt. No. 50, ¶ 17). The Corps conducted a compliance inspection on April 30, 2003, determined defendants were in compliance with Sections 301 and 404 of the Clean Water Act, and issued a permit under Section 404 of the Clean Water Act, Nationwide Permit No. 14, for the culvert bridge on May 13, 2003 (Dkt. Nos. 55, ¶ 3; 63-13). After reviewing the four-culvert bridge, concluding that it created flow and flooding risks, and finding it non-compliant, the Corps inspected and approved of the five-culvert bridge (Dkt. Nos. 63-11; 63-13).

Despite the Corps' approval, there is record evidence from which a reasonable fact finder could conclude that plaintiffs began complaining about the effects of the five-culvert bridge starting in 2009 at the latest, purportedly putting defendants on notice of their complaints at least by the date of Mr. Carney's September 16, 2009, letter (Dkt. No. 63-10, at 128).

From this record evidence, the Court concludes that there are disputed issues of material fact regarding whether defendants should have reasonably foreseen flooding once allegations were brought to defendants' attention. These factual disputes preclude the Court from granting defendants' motion for summary judgment.

### d.    Character Of The Land

Plaintiffs claim that the impacted land has been historically productive cropland for rice and soybeans and rely on the report of plaintiffs' second expert Jim Grisham—a farm consultant who has provided an expert opinion in this matter regarding damages suffered to plaintiffs' properties and crops as a result of the culvert bridge—as record evidence (Dkt. Nos. 63, at 11; 63-

14).[6]  Axiomatically, cropland that suffers increased flooding and turns barren is not desirable (Dkt. No. 63, at 11).  Defendants dispute the opinions offered by Mr. Grisham, pointing out the shortcomings in his analysis.  Accordingly, from the record evidence and drawing all reasonable inferences in favor of plaintiffs, the Court finds that genuine issues of material fact are in dispute as to whether plaintiffs' farmland has been historically productive and valuable.

### e.    Expectations

Plaintiffs assert that they have substantial amounts of time and money invested in their cropland, the vast majority of which has been held by plaintiffs' families for a long time (Dkt. No. 63, at 10-11).  Plaintiffs claim that this cropland generally did not experience devastating flooding until defendants built the culvert bridge (*Id.*, at 11).  Mr. Grisham's report and the record evidence outline plaintiffs' reasonable investment-backed expectations regarding the at-issue property (Dkt. No. 63-14).  Coupled with Mr. Johnson's report, Mr. Grisham's report explains how plaintiffs contend the alleged flooding stemming from the culvert bridge has undercut plaintiffs' reasonable investment-backed expectations (Dkt. Nos. 63-4; 63-14).  Defendants dispute the conclusions reached by Mr. Johnson in his report and the opinions offered by Mr. Grisham, challenging this evidence and plaintiffs' theories of causation and resulting alleged damages.

Accordingly, when all reasonable inferences are drawn in favor of plaintiffs, genuine issues of material fact are in dispute as to whether plaintiffs had reasonable investment-backed expectations for their farmland and whether the alleged flooding left those expectations unrealized.

---

[6]  The Court described this expert report in its May 19, 2020, Order that, in part, denied defendants' motion to exclude Mr. Grisham's expert testimony (Dkt. No. 107).

### f.    Severity

Plaintiffs offer the report and anticipated testimony of their expert Mr. Johnson on the alleged severity of the flooding and causation.  Defendants disagree with Mr. Johnson's conclusions regarding the severity of the flooding and causation (Dkt. No. 54, at 19-21). Defendants argue that Mr. Johnson discounts instances where the Egypt gage is in excess of 5,500 cfs—instances where plaintiffs' property would be flooded regardless of the culvert bridge (*Id.*, at 19).  Defendants contend that the additional area which would be flooded as a direct result of the culvert bridge is *de minimis* and that *de minimis* additional flooding will not support an inverse condemnation claim (*Id.*, at 20).  Defendants essentially argue that farmland that is already partially flooded does not become less farmable due to slight additional flooding (*Id.*, at 20-21).

Plaintiffs respond that plaintiffs feel the brunt of the harm from the culvert bridge in increased flood duration, reflected by Table 2 in Mr. Johnson's report, rather than an uptick in flooded area, reflected by Figure 14 in Mr. Johnson's report (Dkt. Nos. 63, at 12; 63-4, at 24, 32). These increased flood durations vary based on the property from 0.3 days to 7.7 days for a given flood, according to plaintiffs (Dkt. Nos. 63, at 12; 63-4, at 24).  For a year such as 2017 wherein Mr. Johnson's model identified 10 flood events impacting plaintiffs' properties, plaintiffs argue these increased flood durations could result in up to 77 more days underwater within a single year than if the wooden bridge were still in place (Dkt. Nos. 63, at 12-13; 63-4, at 31).

From the record evidence, these facts are in dispute.  On the record evidence before the Court, the Court determines that jurors should resolve these disputed factual issues and that they preclude this Court's granting defendants' motion for summary judgment.

Overall, having examined the record evidence and the factors of *Arkansas Game and Fish*, the Court determines there are genuine issues of material fact in dispute and denies defendants' motion for summary judgment on plaintiffs' inverse condemnation claims.

### C.    Additional Claims Under 42 U.S.C. § 1983

In addition to their inverse condemnation claims, plaintiffs suggest through their language several other claims pursuant to 42 U.S.C. § 1983.  Section 1983 states that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or caused to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983. Section 1983 "provides a cause of action for violations of federal statutes as well as the Constitution." *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (citing *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980)).[7]  "In order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (emphasis in original) (citing *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989)).

In their operative amended complaint, plaintiffs do not clearly identify the provisions of the United States Constitution or the precise federal rights upon which they rely for their § 1983 claims.  To the extent the Court can discern what plaintiffs may have intended through their language, the Court addresses each such claim in turn.

---

[7]  To the extent plaintiffs cite with respect to their § 1983 claims the Arkansas Constitution and Arkansas laws plaintiffs contend grant certain liberty interests to plaintiffs in their properties, how they use their properties, and their abilities to earn a living (Dkt. No. 17, ¶ 139), citations to the Arkansas Constitution and Arkansas laws as a basis for § 1983 claims is inappropriate.

1.    **Equal Protection**

Plaintiffs bring a claim pursuant to § 1983 alleging that Lawrence County has deprived them of equal protection of the law as guaranteed by the Fourteenth Amendment of the United States Constitution by preferring its own citizens over the citizens of Craighead County in effectively damming the Slough with the culvert bridge and sending floodwaters onto plaintiffs' lands instead of property in Lawrence County (Dkt. No. 17, ¶¶ 132-38). Defendants argue that nothing in the record evidence suggests disparate treatment and intentional or purposeful discrimination of the sort required to substantiate plaintiffs' equal protection claim (Dkt. No. 69, at 7).

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "Unless a law [or action] burdens a fundamental right, targets a suspect class, or has a disparate impact on a protected class and was motivated by a discriminatory intent, [courts] apply rational basis scrutiny to the challenged law [or action]." *New Doe Child #1 v. United States*, 901 F.3d 1015, 1027 (8th Cir. 2018), *cert. denied sub nom. New Doe Child #1 v. United States*, 139 S. Ct. 2699, (2019) (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979); *Knapp v. Hanson*, 183 F.3d 786, 789 (8th Cir. 1999)). Under rational basis review, "the law [or action] must only be rationally related to a legitimate government interest." *Gallagher v. City of Clayton*, 699 F.3d 1013, 1019 (8th Cir. 2012) (citations omitted). Such an action is "accorded a strong presumption of validity . . . and is upheld if there is any reasonably conceivable state of facts that could provide a rational basis for the [action]." *Id.* (internal quotations and citations omitted).

Here, the Court finds no fundamental right, suspect class, or disparate impact on a protected class accompanied by discriminatory intent implicated by the record evidence before the Court;

therefore, the Court applies rational basis review to defendants' actions. The record evidence indicates that the wooden bridge needed replacing and the only way Lawrence County could make Road 717 accessible was with a bridge featuring railroad car culverts (Dkt. No. 63-10, at 124). Furthermore, the record evidence indicates that, after the Corps found the four-culvert bridge out of compliance, defendants added a fifth culvert to bring the culvert bridge into compliance (Dkt. Nos. 50, ¶ 17; 63-11). Following this addition, the Corps found the five-culvert bridge compliant (Dkt. No. 63-13).

Given this record evidence, the Court finds that no reasonable juror could conclude that defendants lacked a rational basis in building the initial four-culvert bridge or in modifying that bridge by adding a fifth culvert. Accordingly, the Court grants summary judgment in favor of defendants on plaintiffs' federal equal protection claims.

### 2.    Right To Earn A Living

Plaintiffs also assert that defendants' actions intrude upon their right to earn a living in violation of the Fourteenth Amendment to the Constitution (Dkt. No. 63, at 26). The Supreme Court recognizes "that the Privileges and Immunities Clause [of the Fourteenth Amendment] protects the right of citizens to 'ply their trade, practice their occupation, or pursue a common calling.'" *McBurney v. Young*, 569 U.S. 221, 227 (2013) (quoting *Hicklin v. Orbeck*, 437 U.S. 518, 524 (1978)). As the Eighth Circuit has recognized that "[t]he Constitution only protects [the] liberty [to follow a chosen profession free from unreasonable governmental interference] from state actions that threaten to deprive persons of the right to pursue their chosen occupation. State actions that exclude a person from one particular job are not actionable in suits. . . . It is the liberty to pursue a particular calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment." *Habhab v. Hon*, 536 F.3d 963, 968 (8th Cir. 2008) (quoting

*Piecknick v. Commonwealth of Pa.*, 36 F.3d 1250, 1259-60 (3d Cir. 1994) (citations and internal quotation marks omitted)).  Further, generally the Supreme Court has struck down laws violating this right "only when those laws were enacted for the protectionist purpose of burdening out-of-state citizens."  *McBurney*, 569 U.S. at 227 (citing *United Building & Constr. Trades Council of Camden Cty. v. Mayor & Council of Camden*, 465 U.S. 208 (1984); *Hicklin*, 437 U.S. at 524; *Toomer v. Witsell*, 334 U.S. 385, 395, 397 (1948).  The Court finds no such fact pattern here.

To the extent plaintiffs intend to rely on their right to earn a living to allege a Fourteenth Amendment claim based on procedural or substantive due process, the Court examines each claim in turn.

### a.        Procedural Due Process

To state a claim for a violation of procedural due process, the plaintiff must allege:  "(1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest."  *Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955, 965-66 (8th Cir. 2015) (citations omitted).  To establish a procedural due process violation, a plaintiff must prove that he was deprived of "an opportunity . . . granted at a meaningful time and in a meaningful manner for [a] hearing appropriate to the nature of the case."  *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971) (internal citation and quotation marks omitted).  To the extent plaintiffs purport to base this claim on their right to earn a living, the Court finds no protected interest and, therefore, need not decide what if any procedural process was due.  *Forrester v. Bass*, 397 F.3d 1047, 1057 (8th Cir. 2005).

In their filings, to the extent plaintiffs allege that "defendants have deprived plaintiffs of their private property, due process rights, and liberty interests guaranteed by Fourteenth

Amendment of the United States Constitution," intending to describe their takings claim (Dkt. No. 17, ¶ 133), for the reasons explained, the Court denies defendants summary judgment on plaintiffs' inverse condemnation claim.

### b.    Substantive Due Process

To establish a violation of substantive due process, a plaintiff "must demonstrate *both* that the official's conduct was conscience-shocking, and that the official violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 815 (8th Cir. 2011) (emphasis in original).  The right to engage in a chosen profession is not a fundamental right for purposes of a substantive due process analysis.  *See e.g., Robbins v. Becker*, 794 F.3d 988, 994 (8th Cir. 2015) (plaintiffs' allegations that they were deprived of the right to make a living and engage in their chosen occupation do not shock the conscience for due process purposes); *Wrench Transp. Sys., Inc. v. Bradley*, 340 F. App'x 812, 815-16 (3d Cir. 2009) (intangible employment rights such as the "right to engage in business" are not entitled to substantive due process protection); *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 n.4 (11th Cir. 2009) (noting that "employment rights do not enjoy substantive due process protection because such rights are. . . not 'fundamental' rights created by the Constitution"); *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 n.12 (3d Cir. 2006) ("[t]o the extent [plaintiff's] substantive due process claim was based not only on loss of his job, but also on reputational injury that decreased his 'ability to earn a living,' it also fails.").  As a result, any alleged substantive due process claim asserted on this basis by plaintiffs fails.

### 3.    Deliberate Indifference

Plaintiffs also assert that defendants have shown a "deliberate indifference" to plaintiffs for harm caused by the culvert bridge (Dkt. No. 63, at 19).   In the context of federal rights, "deliberate indifference" normally applies to Eighth Amendment claims.   Both the Eighth and Fourteenth Amendments impose duties on state officials regarding the safety and well-being of individuals in their custody.   The Eighth Amendment "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes."   *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).   As it concerns conditions of confinement and medical care, a state official violates a prisoner's Eighth Amendment rights when he or she is "deliberately indifferent" to a substantial risk of serious harm. *See Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009).

To the extent plaintiffs through their language suggest an Eighth Amendment violation, the Court finds as a matter of law the Eighth Amendment inapplicable based on the undisputed record evidence.

### D.    Violation of ACRA

In addition to asserting a takings claim under Article 2, Section 22 of the Arkansas Constitution, plaintiffs purport to bring other state causes of action under the ACRA.   Based on the Court's review of plaintiffs' operative amended complaint, it appears plaintiffs intend to allege the following claims:   (1) deprivation of a "right to use and enjoy their properties pursuant [to] Article 2, Sections 2, 8, and 22 of the Arkansas Constitution, among other constitutional provisions"; (2) deprivation of plaintiffs' equal protection of the law as guaranteed by the Arkansas Constitution; (3) a right of redress for their injuries under Article 2, Section 13 of the Arkansas Constitution; and (4) damages for their property rights and liberty interests that have been destroyed, impeded, or unduly burdened by defendants' actions and an injunction ordering

defendants to remove the culvert bridge and allow the free flow of floodwaters and debris through the Slough (Dkt. No. 17, ¶¶ 153-58). Plaintiffs argue that the record evidence at minimum gives rise to a number of reasonable inferences that defendants possessed the intent to harm—intentionally or through reckless indifference—and that such evidence suffices to submit the question of intent to a jury (Dkt. No. 63, at 25). Defendants argue that plaintiffs' claims under the ACRA "are without merit and should be dismissed" (Dkt. No. 53, ¶ 3).

> The ACRA provides the following:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of this state or any of its political subdivisions subjects, or causes to be subjected, any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Arkansas Constitution shall be liable to the party injured in an action in circuit court for legal and equitable relief or other proper redress.

Ark. Code Ann. § 16-123-105(a). "In construing the [ACRA], we may be guided by state and federal decisions interpreting the federal Civil Rights Act, 42 U.S.C. § 1983." *Harmon v. Payne*, 592 S.W. 619, 623 (Ark. 2020). In bringing their ACRA claim, plaintiffs explicitly invoke Article 2, §§ 2, 8,[8] 13, and 22 of the Arkansas Constitution. Additionally, plaintiffs bring a claim alleging a deprivation of "[e]qual protection under the law is [governed] by . . . [A]rticle 2, [S]ections 2, 3, and 18 of the Arkansas Constitution" (Dkt. No. 17, ¶¶ 153, 155). *See Arnold v. State*, 384 S.W.3d 488, 494 (Ark. 2011).

The Court has already examined plaintiffs' takings claim under Article 2, Section 22 of the Arkansas Constitution and concluded that this claim survives summary judgment. However,

---

[8]    The Court notes that Article 2, § 8 of the Arkansas Constitution relates to criminal charges, self-incrimination, criminal due process, double jeopardy, and bail. Ark. Const. art. II, § 8. To the extent plaintiffs bring any claims pursuant to this provision in this civil action, the Court grants summary judgment in favor of defendants on those irrelevant claims.

plaintiffs' takings claim is the sole state constitutional claim addressed by defendants' motion and attendant filings (Dkt. Nos. 53, ¶ 3; 54, at 12-23).

Under a generous reading of the briefs, defendants may address plaintiffs' Arkansas Constitution equal protection claim under the ACRA.  The Arkansas Supreme Court has stated that "[i]n deciding whether an equal protection challenge is warranted, there must first be a determination that there is a state action which differentiates among individuals." *Arnold*, 384 S.W.3d at 495 (quoting *Ghegan & Ghegan v. Barclay*, 49 S.W.3d 652 (Ark. 2001).  "Once equal protection is invoked, we must then decide what standard of analysis applies." *Id.* (citing *Bosworth v. Pledger*, 810 S.W.2d 918 (Ark. 1991)).  "In other words, we must determine whether it is necessary only to show some rational basis for the classification, or whether the statute impinges on a fundamental right or is based on a suspect criterion, in which case a higher standard of scrutiny would apply." *Id.* (citing *Bosworth*, 810 S.W.2d at 918).

The purportedly "disadvantaged class" in this case is comprised of farmers in Craighead County alleging increased farmland flooding due to defendants' action in Lawrence County.  "This class is not constitutionally suspect," and defendants' actions "do not impermissibly interfere with a fundamental right." *Id.*  "Because no suspect classification or fundamental right is impacted by" defendants' actions, "the applicable constitutional standard of review is the rational-basis test." *Id.* (citing *LaFont v. Mixon*, 374 S.W.3d 688 (Ark. 2010)).  Plaintiffs bear the burden to prove defendants' actions unconstitutional, and under the rational basis test they must prove that defendants' actions are "not rationally related to 'achieving any legitimate governmental objective under any reasonably conceivable fact situation.'" *See id.* (quoting *Talbert v. State*, 239 S.W.3d 504 (Ark. 2006)).

For the reasons explained in discussing plaintiffs' federal equal protection claim, the Court finds that no reasonable juror could conclude defendants' actions were not rationally related to achieving any legitimate governmental objective under any reasonably conceivable fact situation. Accordingly, the Court grants summary judgment in favor of defendants on plaintiffs' state equal protection claims.

With respect to any other claims plaintiffs assert under the ACRA, at summary judgment, the initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 323. By neglecting to raise arguments regarding and by failing to brief plaintiffs' remaining state constitutional claims, defendants have failed to meet this burden. Accordingly, the Court denies defendants' summary judgment on plaintiffs' remaining state constitutional claims.

### E.    *Ex Parte Young*

Plaintiffs seek an injunction removing the culvert bridge and allowing the free flow of floodwaters and debris through the Slough unimpeded purportedly under what plaintiffs term an *Ex parte Young* claim (Dkt. No. 17, ¶ 188). Plaintiffs' *Ex parte Young* claim is premised on the County's alleged violation of their property, equal protection, and due process rights secured by the United States Constitution (Dkt. No. 63, at 26).

The doctrine of *Ex Parte Young* addresses when the Eleventh Amendment bars specific claims against state actors seeking injunctive relief. This doctrine itself confers no substantive rights. Instead, it addresses the propriety of awarding certain remedies for violations of rights. Therefore, the Court finds it inappropriate to purport to base a claim on the doctrine.

The Eleventh Amendment "bars a suit brought by a private individual against a State." *McDaniel v. Precythe*, 897 F.3d 946, 951 (8th Cir. 2018) (citing *Idaho v. Couer d'Alene Tribe of*

*Idaho*, 521 U.S. 261, 267-68 (1997)).  However, "[u]nder the *Ex Parte Young* doctrine, a private party can sue a state officer in his official capacity to enjoin a prospective action that would violate federal law."  *Church v. Missouri*, 913 F.3d 736, 747 (8th Cir. 2019) (quoting *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011)).  "In determining whether this exception applies, a court conducts 'a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"  *281 Care*, 638 F.3d at 632 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

Plaintiffs sue Lawrence County; separate defendant John Thomison, in his official capacity as County Judge for Lawrence County; and remaining defendants in their official capacities as members of the Lawrence County Quorum Court (Dkt. No. 17, at 1).  Amendment 55 to the Arkansas Constitution makes clear that County Judges and members of a county Quorum Court are county officials rather than state officials.  Ark. Const. amend. LV, §§ 1-6.  Thus, each defendant is either a county or an individual sued in his official capacity as a *county* official.  Under Arkansas law, "[a] county is a municipal corporation."  *White County v. Cities of Judsonia, Kensett & Pangburn*, 251 S.W.3d 275, 279 (Ark. 2007) (citing *Stilley v. Henson*, 28 S.W.3d 274 (Ark. 2000)).  As municipal corporations, counties "are creatures of the legislature and as such have only the power bestowed upon them by statute or the Arkansas Constitution."  *Municipality of Helena-West Helena v. Weaver*, 286 S.W.3d 132, 136 (Ark. 2008) (quoting *White County*, 251 S.W.3d at 279).

The Supreme Court has "held that the Eleventh Amendment does not apply to 'counties and similar municipal corporations.'"  *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 123 n.34 (1984) (quoting *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 280 (1977)); *see also Alden v. Maine*, 527 U.S. 706, 756 (1999).  "At the same time, [the Supreme Court has]

36

applied the [Eleventh] Amendment to bar relief against county officials 'in order to protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself.'" *Id.* (quoting *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979)). The issue is whether the Lawrence County Quorum Court "is to be treated as an arm of the State . . . or is to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend." *Hadley v. North Ark. Cmty. Technical Coll.*, 76 F.3d 1437, 1438 (8th Cir. 1996) (quoting *Mt. Healthy*, 429 U.S. at 280). In deciding whether an entity is an "arm of the state," the Supreme Court has considered several factors including: (1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government. *See Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 44-51 (1994). The first factor—the liability of the State for a judgment—is the foremost factor. *See id.* at 51.

In considering these factors, there is no record evidence before the Court that Lawrence County, Judge Thomison, or the Lawrence County Quorum Court should be considered an arm of the state. Plaintiffs maintain that Lawrence County, through Judge Thomison and the rest of the Quorum Court, bears the responsibility for constructing and maintaining the culvert bridge rather than the State of Arkansas (Dkt. Nos. 17, ¶¶ 160-88). There is no record evidence before the Court that the State of Arkansas risks any potential liability for a judgment against defendants, exercises a degree of state control or veto power over defendants' actions related to the culvert bridge, or appoints the County Judge or members of the Quorum Court. Constructing and maintaining a

bridge could fall within the traditional purview of either state or local government, though Arkansas' statutory scheme appears to place the culvert bridge within Lawrence County's purview. If that is the case and if Lawrence County, Judge Thomison, and the members of the Lawrence County Quorum Court should be considered county officials for purposes of plaintiffs' claims, the Eleventh Amendment is rendered irrelevant, and plaintiffs need not pursue injunctive relief by relying on the doctrine of *Ex parte Young*.[9]

V.    **Conclusion**

The Court concludes, based on the record evidence taken in a light most favorable to defendants, that there are genuine issues of material fact in dispute regarding plaintiffs' public nuisance claim under § 18-15-703 (Dkt. No. 17, ¶¶ 87-98). Therefore, the Court denies plaintiffs' motion for partial summary judgment (Dkt. No. 48). Additionally, the Court concludes, based on the record evidence taken in a light most favorable to plaintiffs, that there are genuine issues of material fact in dispute regarding plaintiffs' public nuisance claim under § 18-15-703, takings claim under both the United States Constitution and the Arkansas Constitution, and additional constitutional claims brought pursuant to the ACRA (Dkt. No. 17, ¶¶ 87-113, 144-159). Therefore, the Court denies defendants' motion for summary judgment as it relates to these claims (Dkt. No. 53). However, the Court grants defendants' motion for summary judgment as it relates to plaintiffs' federal and state equal protection claims, and the Court determines that the *Ex parte Young* doctrine confers no substantive rights (Dkt. Nos. 17, ¶¶ 113, 160-190; 53).

So ordered this 19th day of May, 2020.

*Kristine G. Baker*
Kristine G. Baker
United States District Court Judge

---

[9] This conclusion has no bearing on plaintiffs' claims for injunctive relief pursuant to § 18-15-703 because that request comes pursuant to state law rather than federal law.